IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL WALKER, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| | Civil Action |
| v. | No. 11-2217 (JBS/KMW) |
| UNITED STATES SECRETARY OF THE AIR FORCE, et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Michael O. Kassak, Esq.
White & Williams, Esqs.
457 Haddonfield Road, Suite 400
Cherry Hill, NJ 08002
     Attorney for Plaintiff

David Vincent Bober, AUSA
Office of the U.S. Attorney
District of New Jersey
402 East State Street, Room 430
Trenton, NJ 08608
     Attorney for Defendants

**SIMANDLE, Chief Judge:**

**I.   INTRODUCTION**

    Plaintiff Michael Walker brought this action against

Defendants United States Secretary of the Air Force and the

Department of the Air Force (collectively, "Air Force") alleging

violations of the Americans with Disabilities ("ADA"),

Vocational Rehabilitation, and Civil Service Reform Acts. Walker

alleges that he was disabled and that the Air Force, his former

1

employer, refused to accommodate his disability, discriminated against him on the basis of his disability, retaliated against him, and unlawfully terminated him. This matter comes before the Court on the Defendants' motion for summary judgment [Docket Item 26] and Plaintiff's motion for summary judgment [Docket Item 24].

The Court will deny Plaintiff's motion and grant Defendants' motion because there are no genuine disputes of material fact: Walker does not qualify as disabled under the ADA. Because he was not disabled under the ADA, his discrimination, accommodation, hostile work environment, and disparate treatment claims fail. Moreover, there was no retaliation. Walker was terminated due to a history of misconduct, including telling his supervisor to put his appraisal "where the sun don't shine," removing files from a supervisor's locked drawer when she was on maternity leave, going pheasant hunting while on sick leave, and disregarding multiple deadlines.

## II. BACKGROUND

### A. Air Force Employment

Plaintiff Michael Walker, a civilian and Army veteran, began employment with the Air Force in 1993 as a Communications-Computer Systems Specialist. (Pl. Statement of Undisputed Material Facts ("SOF") ¶ 1.) He was promoted to Supervisory

2

Computer Assistant at McGuire Air Force Base in 2000. (Pl. SOF ¶ 2.) His responsibilities included "overseeing the medical database." (Def. SOF ¶ 5.)

### 1. Performance Appraisals Before Plaintiff's Injury

In 2001, Walker's supervisor Craig Bard evaluated Plaintiff and, although Walker's scores were positive, Bard noted "I still sense some struggles w/ working with your staff. In-fighting? Team?" and "seem disgusted or put off by requests." (Def. Mot. Ex. A.) In a 2002 appraisal, Bard wrote "you have to work on communication to me (#1)." (Def. Mot. Ex. B.) In a 2003 appraisal, Bard noted "Defensive nature is seen by many. Unwilling follower . . . . Seem to pass a lot of items out to others . . . ." (Def. Mot. Ex. C.)

When asked to describe his relationship with Bard, Walker said: "As with all supervisors with me, as chief information officer, it was a tough one. There was a lot of head butting going on there." (Walker Dep. 51:14-18.)

In July 2003, Capt. Kathy Pflanz became Walker's supervisor. (Def. SOF ¶ 9.) In October 2003, she appraised Plaintiff and noted, "Be responsive to customers..don't say 'I'm too busy, I don't have time,'" "Be proactive...schedule time offs appropriately," and "Communication . . . can always get even better. I shouldn't have to go to you to find out things . . . ." (Def. Mot. Ex. D.)

### 2. Injury

In November 2003, Walker suffered a traumatic brain injury at his home. (Def. SOF ¶ 12.) He "split open" his head on a "cinderblock curb," was rendered unconscious, and remained in a coma for approximately a week. (Id. ¶ 13.) He sustained multiple hemorrhages. (Pl. SOF ¶ 4.) When he awoke, he was unable to speak; his speech gradually returned, although speaking was more "energy intensive." (Def. SOF ¶ 14.) He also had problems with reading and writing; those skills returned with greater difficulty than before the accident. (Id. ¶ 15.)

Walker returned to work in January 2004. (Id. ¶ 16.) Returning to work "helped a lot" with his speaking, reading, and writing. (Id. ¶ 17.) After returning to work, Walker was able to engage in leisure activities that he enjoyed before his accident, including hunting and skiing, cooking, and walks of 7-8 miles. (Id. ¶¶ 18, 20.)

### 3. Performance Issues in 2004-2006

On April 20, 2004, Plaintiff had an altercation with a subordinate, Norman Corbin, who filed a grievance against Plaintiff "with the accusation of being Pushed . . . ." (Def. Mot. Ex. E.) Walker said: "I was giving Corbin some sort of order, and this guy came running towards me. And I was standing in the doorway, and I was very weak, and the only thing I could do was grab a hold of him." (Walker Dep. 70:10-14.) On May 13,

2004, Walker's supervisor Capt. Pflanz verbally admonished Walker. (Def. Mot. Ex. E.)

On May 14, 2004, Pflanz appraised Plaintiff and "[d]iscussed technical performance was good but needed to work on supervisory skills in communication, even temperament . . . ." (Id.) On July 1, 2004, Pflanz "spoke w/ Mr. Walker about notifying me if he is going to be late to work . . . ." (Id.)

In August 2005, Capt. Sophie Kiesow replaced Pflanz as Walker's supervisor. (Def. SOF ¶ 30.) On August 9, 2005, Walker approached her, and Kiesow memorialized this conversation in a memorandum. (Def. Mot. Ex. F.) When asked whether this memorandum reflected his recollection of the meeting, Walker responded: "It's similar." (Walker Dep. 93:2-5.) Walker told Kiesow, "I'm not sure we will work well together...you've probably already heard negative things about me." (Def. Mot. Ex. F.) Kiesow told Walker "no one has spoken about him in a mean or derogatory way . . . ." (Id.) Kiesow noted that Walker "reiterated that we probably won't get along and that I'll probably have some issues with him. He then went on to explain that he sustained a head injury and that it affected his memory." (Id.) He did not request accommodations. (Walker Dep. 86:17-19.) Kiesow wrote that "Walker's tone and demeanor . . . was very authoritative, standoffish, short, and overall cold." (Def. Mot. Ex. F.)

5

In January 2006, Walker submitted a memorandum to be routed to a commanding officer and Kiesow asked Walker to provide a cover letter summarizing the memorandum and the action required from the commanding officer. (Def. Mot. Ex. G at 2.) Walker responded, "I'll get to it when I can." (Id.) When Kiesow said that was an unacceptable response, Walker said, "I suggest you talk to [Civilian Personnel Office]." (Id.) Kiesow later emailed Walker that "you do not accept constructive criticism well. Today, your negative, defensive, and slightly hostile attitude towards me made me uncomfortable." (Def. Mot. Ex. G at 2.)

On January 6, 2006, Kiesow issued a "letter of counseling" to Walker. (Def. Mot. Ex. G at 1.) The letter stated: "On the morning of 06 Jan 06, you were disrespectful to me, your direct supervisor . . . . You are hereby counseled. Your behavior demonstrates disregard for supervisory authority." (Id.) When Kiesow tried to discuss the letter, she perceived that Walker "was extremely argumentative, hostile, and unresponsive to my requests for him to allow me to speak uninterrupted . . . ." (Def. Mot. Ex. H.) MSgt. Jose Reyes observed the meeting; he described it as "heated" and noted that "Capt Kiesow asked Mr. Walker to withhold his comments until she completed additional statements . . . Mr. Walker did not comply with her request and continued to speak over Capt Kiesow." (Def. Mot. Ex. I.)

In March 2006, Kiesow tasked Walker with supervising the "de-duping" of duplicate patient files. (Def. SOF ¶ 46.) When Walker was assigned the project, approximately 900 files required de-depulication. (Id. ¶ 47.) Walker assigned the task to a subordinate, Corbin. (Id. ¶ 48.) Walker asked Corbin to "capture and forward completion metrics to me daily." (Id. ¶ 49.) On May 11, 2006, Walker emailed Kiesow "25~900 completed." (Def. Mot. Ex. K at 2.) Kiesow responded, "I find it amazing that in over a month's time, only 25 of 900 were completed . . . . Did you receive daily competition [sic] metrics [from Corbin] as you asked? If not, did you document Mr. Corbin's non-compliance with providing daily metrics?" (Id.) Kiesow emphasized "how important it is to have all of these cleaned up prior to AHLTA 'go-live' date" and asked, "What is **your plan** for duplicate patient clean up by the go live date . . . . I need to know immediately." (Id. (emphasis in original).) Walker responded, "Bottom line is that the 856/41 duplicate patients that have not been merged will have a "MINIMAL" impact . . . ." (Id. at 1.) Col. Snyder also emailed Walker and said: "Your staff was assigned to fix the 900 names and I've asked multiple times for the status without answer. If it is not done, we all will be coming in this weekend until the list is done." (Def. Mot. Ex. L.)

7

In April 2006, Kiesow gave Walker a performance rating of "acceptable," rated Walker as a 5 or 6 (on a scale of 1 to 9) in nine different appraisal factors, and recommended a bonus of $494.34. (Def. SOF ¶¶ 52-53.) Walker felt that it was the "lowest appraisal" he had ever received. (Def. SOF ¶ 54.) Walker complained about the low ratings and told Kiesow to put the appraisal "where the sun don't shine." (Id. ¶¶ 55-56.)

On June 21, 2006, Kiesow emailed Walker regarding submission of the Weekly Activity Report ("WAR") and stated, "This is ridiculous. Why does this keep coming up? Why can't we ensure this is done?" (Def. Mot. Ex. Q.) In a follow-up email, Kiesow wrote, "As your supervisor, I have directed you, on multiple occasions, that the WAR is your responsibility. . . ." (Id.)

In September 2006, Kiesow gave Walker a "formal feedback" memorandum. (Def. SOF ¶ 79.) The memorandum noted, inter alia, "[y]ou are absent or late to meetings routinely"; "[w]hen you do attend meetings, . . . you are routinely not fully knowledgeable, up to date, or just don't provide very much detail"; "[t]he entire time the WAR was your responsibility, you rarely turned them in on time"; "[i]t is difficult for me to help you . . . when you become defensive, disrespectful, and/or hostile . . . ." (Def. Mot. Ex. AA.)

8

### 4. Brief Assumption of Kiesow's Responsibilities

In 2006, Walker briefly served in Kiesow's role as flight commander. Walker perceived that he was promoted to Kiesow's position because "Colonel Snyder had sat there with me and Kiesow and told her, "You're relieved from your position. Mr. Walker is the flight commander.'" (Walker Dep. 117:21-23.) Walker also, however, stated that when he received the flight commander title, it was not a promotion, (id. 22:15-18); testified that Kiesow "had gone on maternity leave or had been relieved or whatever the case may be," (id. 119:1-3); and acknowledged that his pay and grade did not change when he assumed the flight commander position, (id. 122:17-22).

Kiesow testified that her son was born in July 2006, she was on maternity leave for seven weeks, and Walker covered managerial responsibilities during her absence. (Kiesow Dep. 15:10-16:2.) Snyder testified that Walker became flight commander while Kiesow was on maternity leave until she "returned from convalescent leave and became flight commander again." (Snyder Dep. 118:25-119:5, 13:7-10.) Snyder also testified that Kiesow replaced Walker as part of a policy to develop young officers and as part of a restructuring. (Snyder Dep. 27:18-28:1, 30:2-6.) There is no evidence of restructuring.

While Walker was the flight commander, he shared a New Jersey state disability certification and two medical documents

with Snyder "since he was my immediate supervisor, and I thought
he had a need to know." (Walker Dep. 118:17-18.) Walker told
Snyder, "I have a disability." (Walker Dep. 118:20.) Snyder
asked Walker what to do with the documents and Walker said
"nothing. . . . Just know about it." (Snyder Dep. 22:22-23:1.)

Walker perceived that a "short period of time" after he
shared the documents, "Captain Kiesow was brought back in and
placed immediately back in her position . . . ." (Walker Dep.
120:23-121:6.) Walker's pay and grade did not change when Kiesow
reassumed the flight commander position. (Walker Dep. 122:23-
123:1.) Walker believed he had been demoted because "I
supervised 10 people and that has been reduced to 3 Government
Service employees." (Def. Mot. Ex. S.)

### 5. First Suspension

On September 6, 2006, Kiesow gave Walker notice that she
intended to suspend him for three days for his failure to
complete the de-duplication project and for telling her to place
the appraisal "where the sun don't shine." (Def. SOF ¶ 69.)

On September 22, 2006, Kiesow rescinded the proposed 3-day
suspension and, instead, recommended a 5-day suspension. (Def.
Mot. Ex. V.) In addition to the de-duplication project and the
appraisal comment, Kiesow added "Lack of Candor" because: when
she returned from maternity leave, she noticed Walker's
personnel file was missing from her locked drawer; she emailed

Walker to ask whether he had it or had seen it; he said he had
not seen it and did not know anything; TSgt Merrington later
told Kiesow that she watched Walker remove it from Kiesow's
desk; Kiesow emailed Walker stating that she was informed that
Walker might have the file; Walker responded that he knew TSgt
Merrington "was searching for it but I don't remember whether
she had it or I had it"; Kiesow emailed Walker again and said,
"TSgt Merrington said that you went into my office, found the
key to my desk and got your folder . . . . Is that accurate?";
Walker responded, "Probably so but not remembering 100%."  (Def.
Mot. Exs. V at 2-3, W.)

Lt Col Snyder suspended Walker for five days. (Def. Mot.
Ex. X at 1.) Walker filed a grievance. (Def. SOF ¶ 76.) Col.
Martin reduced the suspension to four days and explained:
"[t]his mitigation in no way excuses your misconduct and I
believe the three charges of misconduct are supported by a
preponderance of the evidence . . . . However, I was impressed
by the professionalism and acceptance of responsibility . . .
you showed in my office." (Def. Mot. Ex. Z.)

### 6. Plaintiff's Inquiries Regarding His Brain Injury

On June 21, 2006, Walker emailed Civilian Personnel seeking
"Advice/Guidance" because "I am contemplating submission of my
Disability Certification for Federal Employment . . . ." (Def.
Mot. Ex. OO at 2.) Sharon Beam responded with information about

11

the disability retirement application process. (Id.) Walker
responded, "I am aware of . . . disability retirement.
Advice/guidance I am looking for is related to my Disability
Certification for Federal Employment and vocational
rehabilitation services . . . . I need and can continue working
in this or assigned to a position where I can recover the skills
I have lost based on my disability." (Id. at 1.) Beam replied
with a letter requesting medical documentation. (Id.)

Beam's letter, which was dated June 28, 2006, stated
"please be advised that we are unable to determine if you have
any medical restrictions that may require accommodation because
you have not yet submitted any administratively acceptable
medical documentation." (Def. Mot. Ex. PP at 1.) The letter
asked: "How does your medical condition(s) interfere with your
ability to perform the critical aspects of your job? What type
of accommodations could your physician prescribe that would
enable you to work in either a full or part-time capacity? How
will any recommended accommodation or consideration allow you to
perform the critical aspects of your job?" (Id.)

On July 14, 2006, Walker faxed Beam nine pages. (Def. SOF ¶
115.) The fax included a "Disability Certification for Federal
Employment" from the New Jersey Department of Labor and
Workforce Development, which stated that Walker "was Certified
Eligible to receive Division of Vocational Rehabilitation

12

Services on 5/3/06." (Def. Mot. Ex. QQ at 3.) There was also a
February 16, 2006 letter from Dr. Seth M. Keller stating that
"the temporal lobe would impair [Walker] in terms of perhaps
perception, fatigue and some memory dysfunction as well as
language dysfunction. . . . Perhaps he could be put in a certain
work position that would enable his work style of depth of work
to be less strenuous and arduous. If this can't be done, perhaps
he should consider disability." (Id. at 4.)

There was a second letter dated February 20, 2006 from
Lewis A. Lazarus, a clinical neuropsychologist. (Id. at 5.)
Lazarus found results were "most significant for prominent
memory deficits" and "[i]ntact functioning was noted in terms of
attention, language, visuo-spatial processes, and executive
control functions." (Id. at 8.) Lazarus concluded that "Walker
is expected to have significant difficulties in performing his
job related duties without significant compensatory strategies
(i.e., notes, lists, etc.). In addition, he is expected to have
difficulties in managing stress . . . ." (Id. at 8-9.) Lazarus
recommended "medication for the noted memory deficits" and
"[s]upportive individual counseling." (Id. at 9.)

Beam suggested that Walker provide a copy of his medical
documentation to his supervisor. (Def. SOF ¶ 132) Walker
responded that "my supervisor was given a copy for viewing

13

before I faxed to you." (Def. SOF ¶ 133.) The person whom he was referencing was Snyder. (Walker Dep. 172:5-10.)

William Barnes, a Human Resources Specialist, perceived that the documents "didn't indicate that there was anything wrong that couldn't be alleviated by Mr. Walker taking good notes or maintaining lists . . . ." (Barnes Dep. 57:18-21.) In addition, Barnes and his supervisor, Bethy Stouck, perceived that this documentation was not administratively acceptable. (Barnes Dep. 35:21-36:4.) No one communicated this assessment to Walker.

At his deposition, Barnes said the medical reports were "evidence of disability." (Barnes Dep. 47:5-9.)

In September 2006, Walker requested "additional official duty time" to respond to the first suspension notice "based on my reading, writing, speech, memory and fatigue related Disability . . . ." (Def. Mot. Ex. SS at 4.) Bethy Stouck "look[ed] into what constitutes a reasonable amount of time (taking into consideration that Mike does has [sic] a problem) . . . ." (Id. at 1.) Barnes determined two hours would be appropriate. (Id.)

### 7. Reassignment Request

On September 22, 2006, Kiesow emailed Walker that his keys, which gave him access to her office, would be taken away due to "my trust issues with you (re: entry into my locked office to

14

get your folder without its return)." (Def. Mot. Ex. UU at 5.)
Walker forwarded the email to Snyder, said "[t]hese trust issues
are shared," and requested reassignment. (Id.) Snyder consulted
with Barnes and learned that there were no vacancies for which
Walker was qualified. (Id. at 3.)

On September 25, 2006, Snyder inquired: "Are there legal
ramifications in Mr. Walker not revealing his health issues to
management?" (Id.) Barnes responded that "it's Mr. Walker's
burden to prove via administratively acceptable medical
documentation that his medical conditions are causing problems
at work & request accommodation for his disability, if any."
(Id. at 2-3.) Snyder responded, "since Mr. Walker has not
revealed his medical condition and it appears that it may/is
impairing his ability to perform, can we legally pursue a course
that the employee withheld critical medical information from
management?" (Id. at 2.) Barnes responded: "Since he hasn't met
his burden of proving that he has a medical disability requiring
accommodation by submitting administratively acceptable medical
documentation to his supervisor and requesting accommodation, .
. . [h]is supervisor has no other option but to treat him as if
he has no disability, as she is currently doing." (Id. at 1.)

### 8. Second Suspension

On November 21, 2006, Human Resources Specialist William
Barnes called Walker; Walker called back from an off-base number

and said that he was "hunting pheasant." (Def. Mot. Ex. BB at
1.) Barnes called Kiesow who told him that Walker had requested
sick leave to attend a medical appointment. (Id.) Kiesow wrote
that Walker "misled me into believing that he needed a full day
off specifically due to medical necessity and he himself listed
a full eight hours sick leave . . . on his timesheet." (Def.
Mot. Ex. BB at 2.) When asked whether Kiesow's memorandum was
accurate, Walker testified "[y]es, probably so." (Walker Dep.
141:17-19.)

On November 28, 2006, Col. Anderson emailed Lt. Col. Snyder
and asked: "Since we are doing our best to help Mr. Walker
succeed, I'm assuming you are using your task list? He may think
we are singling him out however using and applying the task list
. . . will go a long way when he uses that one as an excuse and
grievance." (Pl. Mot. Ex. H.) Snyder responded "No one is
singled out. . . . all in agreement w/ current strategy for both
underperforming members. We will document, coordinate, and
discipline accordingly. Walker continues to provide events that
are actionable." (Id.)

On December 6, 2006, Snyder wrote a memorandum noting that,
despite a reminder, Walker failed to approve transactions on the
Government Purchase Card account and, as a result, the account
was suspended. (Def. Mot. Ex. DD.) Snyder noted that "Walker did
not notify anyone within his section or chain of command of this

16

information." (Id.) Even though the account suspension occurred
on October 20, 2006, other people in the section did not learn
about it until November 30, 2006. (Id.) Snyder wrote that Walker
would be removed as primary approving official on the account
and that "Capt Kiesow will initiate a proposal for formal
disciplinary action . . . to address Mr. Walkers disregard for
his known CARE account responsibilities." (Id.)

On April 2, 2007, Kiesow gave Walker notice of a proposed
ten-day suspension based on his "Deliberate Misrepresentation"
in going pheasant hunting while on sick leave and his "Fail[ure]
to Carry Out Assigned Work" regarding the purchase account
suspension. (Def. Mot. Ex. EE at 1.)

After receiving the notice, Walker met with Lt. Col. Donald
Cole. (Def. SOF ¶ 87.) Cole wrote: "This meeting was set up by
Mr. Walker to rebut the second suspension proposal . . . .
Walker stated that he has neurological damage which causes him
to periodically take a break from work. He presented me a note
from his Doctor which indicated a recommended medical absence
from work on the day in question. When asked what his Doctor
told him to do with his day off, he stated rest. I asked if
hunting was in line with the doctor's intent. Mr. Walker said,
'no, but if he is home for the day, he is not staying inside all
day.'" (Def. Mot. Ex. FF.) Cole concluded that "I am not clear
how bird hunting reduces stress, but the inconsistencies are of

17

concern, so I will move forward with the suspension." (Id.) Cole suspended Walker for ten days. (Def. Mot. Ex. GG at 1.) Cole wrote to Walker:  "Your deliberate misrepresentation of the purpose of your leave on 21 November 2006 and both instances of failing to carry out assigned work are inexcusable. You continue to display a complete disregard for the Air Force core value of integrity first." (Id.)

Cole also wrote that Walker "has mentioned mental impairments, but has to date never provided any documentation . . . . Walker said that he provided medical documentation describing his disability to, 'his supervisor at the time', but refuses to expand on any details or further explanation (to whom or when the information was provided). According to Capt Kiesow, Mr. Walker's previous personnel folder did not contain any disability paperwork nor has she been given any . . . . I explained that unless he goes on the record with an official/formal disability, we must treat him and operate as normal." (Def. Mot. Ex. GG at 6.)

### 9. Performance Issues in 2007-2008 and Termination

During the week of August 4, 2008, Walker told Kiesow that he had scheduled a medical appointment the following week. (Def. Mot. Ex. LL at 1.) Walker did not mention the time or date of the appointment and did not submit a leave request. (Id.) Walker testified that he spoke to Kiesow either one or two days before

18

the leave and that he "claimed sick leave" when he spoke to Kiesow because he "didn't know which leave to collect on a family thing." (Walker Dep. 154:9-19.) On August 12, 2008, Walker did not report to work. (Def. Mot. Ex. LL at 1.) Walker attended a court proceeding with his son. (Pl. Response Def. SOF ¶ 103.) On August 13, 2008, Walker told Kiesow he had a medical appointment the previous day. (Def. Mot. Ex. LL at 1.) Walker submitted a retroactive leave request for annual leave due to "addressing of family issues," not a medical appointment. (Id.) At his deposition, he testified that there was no doctor's appointment. (Walker Dep. 155:16-18.)

On August 11, 2008, Kiesow tasked Walker with sending an email by close of business that day regarding telephone service downtime. (Def. SOF. ¶ 101.) Walker sent the email on the morning of August 13, 2008. (Def. Mot. Ex. LL at 2.)

Kiesow began working with Barnes to draft a proposal to fire Walker. In an email exchange, Kiesow told Barnes that she was "struggling . . . . I have searched and searched through my archived emails and don't have much 'proof' aside from whatever I've already turned in. . . . PIF: This is stressing me out too. Mr. Walker's been . . . doing what he's supposed to be doing . . . . it's throwing off what I wrote/updated in the PIF. He's also provided me a very detailed input towards his interim review. In general…I'm perplexed…" (Pl. Mot. Ex. R at 3.)

19

On October 9, 2008, Kiesow issued a "Notice of Proposed Removal" to terminate Walker "for failure to properly request leave and failure to carry out assigned work." (Def. Mot. Ex. LL at 1.) The incidents discussed in the notice were Walker's failure to request leave for August 12, 2008, his misrepresentation that he had a medical appointment on August 12, and his failure to send the telephone service email by the deadline. (Id. at 1-2.) She considered his previous suspensions in making her proposal. (Id. at 2.)

On November 17, 2008, Lt. Col. Cole approved Kiesow's proposal, terminating Walker. (Def. Mot. Ex. MM at 1.) Cole wrote, "Your failure to properly request leave for your absence on 12 August 2008 and your failure to carry out assigned work the previous day are inexcusable. . . . I am disappointed you did not improve your behavior after your previous disciplinary actions." (Id.)

Lt. Col. Snyder was not involved with the decision to terminate Walker because he was only assigned to Maguire Air Force base from June 2005 to June 2007. (Snyder Dep. 6:1-2, 34:12-20.)

Sharon Beam also was not involved in Walker's termination. (Beam Dep. 13:23.) When asked at her deposition "[w]ere you aware of anybody discussing taking action against Mike Walker because he had a brain injury," she responded "[p]robably within

20

the conversations within the office" and said Barnes had participated in those conversations. (Beam Dep. 15:1-16:21.) When she was asked again "whether they took action because of the injury or was it some other reason or do you not know," she responded "I don't know" and acknowledged that Walker was terminated after she retired. (Beam Dep. 42:2-9.)

### B. Procedural History

Walker appealed to the Merit Systems Protection Board, which affirmed the termination. (Pl. Mot. Exs. T & U.)

Walker then filed this action alleging claims under the ADA, the Vocational Rehabilitation Act, and the Civil Service Reform Act for (1) failure to accommodate, (2) unlawful discrimination, (3) retaliation, (4) withdrawal of reasonable accommodation, (5) hostile work environment, (6) aiding and abetting, and (7) disparate treatment. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

### C. Parties' Arguments

Defendants seek summary judgment on all counts. They argue that Walker was neither disabled nor regarded as disabled within the meaning of anti-discrimination laws; the Air Force had legitimate, non-pretextual reasons for firing him; there is no causal connection between Walker's purported protected activity and any adverse employment action; and Walker failed to administratively exhaust several of his claims.

Plaintiff seeks summary judgment on counts (1) failure to accommodate, (2) unlawful discrimination, (3) retaliation, (6) aiding and abetting, and (7) disparate treatment. Plaintiff argues that the Air Force failed to respond to his accommodation request; the Air Force regarded him as disabled; the Air Force failed to engage in an interactive process to determine reasonable accommodations; there is direct evidence of discrimination resulting in his demotion and termination; and circumstantial evidence also shows that Plaintiff should prevail under the McDonnell Douglas test.

## III. STANDARD OF REVIEW

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court must "draw all reasonable inferences in favor of the non-movant." Kowalski v. L & F Products, 82 F.3d 1283, 1288 (3d Cir. 1996).

22

"The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions." United States v. Kramer, 644 F. Supp. 2d 479, 488 (D.N.J. 2008). "When ruling on cross-motions for summary judgment, the court must consider the motions independently and view the evidence on each motion in the light most favorable to the party opposing the motion." Id. (internal citation omitted).

**IV.   DISCUSSION**

The ADA requires covered businesses to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee . . . ." 42 U.S.C. § 12112(b)(5)(A). The Rehabilitation Act applies ADA standards to federal employers. 29 U.S.C. § 791(g). The Rehabilitation Act "'forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement.'" Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007) (quoting Shiring v. Runyon, 90 F.3d 827, 830-31 (3d Cir. 1996)).

The Court will grant Defendants summary judgment on all claims because there are no disputes of material fact: Plaintiff

was not disabled under the ADA and the Air Force did not
retaliate.[1]

## A. Plaintiff Was Not Disabled

Plaintiff does not satisfy the ADA's disability definition.
An "individual with a disability" is an individual who has "(1)
a physical or mental impairment which substantially limits one
or more of such person's major life activities, (2) has a record
of such an impairment, or (3) is regarded as having such an
impairment." Wishkin, 476 F.3d at 185 (citing 29 U.S.C. §
705(20)(B)).[2] The ADA's disability definition must "be
interpreted strictly to create a demanding standard for
qualifying as disabled . . . ." Toyota Motor Mfg., Kentucky,
Inc. v. Williams, 534 U.S. 184, 197 (2002). Plaintiff did not
satisfy any of the three prongs.

### 1. Plaintiff Did Not Have a Qualifying Impairment

Plaintiff's impairments did not qualify under the ADA.
"Merely having an impairment does not make one disabled for
purposes of the ADA. Claimants also need to demonstrate that the

---

[1] Because the Court will grant summary judgment on all claims,
the Court need not address Defendants' argument that Plaintiff
did not administratively exhaust certain claims.

[2] On January 1, 2009, the ADA Amendments Act of 2008 took effect
and "expand[ed] the definition of 'disability' under the ADA and
the Rehabilitation Act." Kania v. Potter, 358 F. App'x 338, 341
n.5 (3d Cir. 2009). The Kania court "concluded that the [ADA
Amendments] Act does not apply retroactively." Id. Because the
events of this case all took place before January 1, 2009, the
ADA Amendments Act does not apply.

impairment limits a major life activity." <u>Toyota</u>, 534 U.S. at
195. The limit must be substantial:

> substantially limit[ed] means [u]nable to perform a
> major life activity that the average person in the
> general population can perform or [s]ignificantly
> restricted as to the condition, manner or duration
> under which an individual can perform a particular
> major life activity as compared to the condition,
> manner, or duration under which the average person in
> the general population can perform that same major
> life activity.

<u>Id.</u> at 195-96 (citation omitted). Major life activities are
activities of central importance to daily life and include
caring for oneself, walking, seeing, hearing, speaking,
learning, sitting, and standing. <u>Kania</u>, 358 F. App'x at 342.

Plaintiff's argument that he was disabled because the State
of New Jersey issued him a "Disability Certification for Federal
Employment" lacks merit. Plaintiff has not cited any case law
holding that this certification establishes disability under the
ADA. Plaintiff also has not provided any evidence of the
standards that the New Jersey Department of Labor and Workforce
Development applied in issuing the certification. Finally,
"state agencies' conclusions are not binding upon federal
courts." <u>Kasper v. City of Middletown</u>, 352 F. Supp. 2d 216, 226
(D. Conn. 2005); <u>see</u> <u>Univ. of Tennessee v. Elliott</u>, 478 U.S.
788, 796 (1986) ("Congress did not intend unreviewed state

administrative proceedings to have preclusive effect on Title VII claims").[3]

Plaintiff also argues that he was disabled because he had decreased memory, language dysfunction, and mental fatigue and medical reports from doctors describing his impairments: Dr. Seth M. Keller stated that "the temporal lobe would impair [Walker] in terms of perhaps perception, fatigue and some memory dysfunction as well as language dysfunction." (Def. Mot. Ex. QQ at 4.) Dr. Lewis A. Lazarus stated Walker's results were "most significant for prominent memory deficits" and concluded that "Walker is expected to have significant difficulties in performing his job related duties without significant compensatory strategies (i.e., notes, lists, etc.). In addition, he is expected to have difficulties in managing stress . . . ." (Id. at 8-9.)

Plaintiff argues that he is substantially limited in the major life activity of cognitive function. (Pl. Opp'n at 31.) Cognitive function is a major life activity. See Gagliardo v. Connaught Labs., Inc., 311 F.3d 565, 569 (3d Cir. 2002) ("concentrating and remembering (more generally, cognitive

---

[3] Elliott is relevant because "[i]n the context of employment discrimination, the ADA, ADEA and Title VII all . . . prohibit discrimination in employment against members of certain classes. . . . the methods and manner of proof under one statute should inform the standards under the others as well." Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 157 (3d Cir. 1995).

function) . . . are major life activities"); Taylor v.
Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999)
("thinking is a major life activity").

Plaintiff has difficulties, but he does not have
substantial limitations. The Court finds persuasive the
reasoning in Weisberg v. Riverside Twp. Bd. of Educ., 180 F.
App'x 357 (3d Cir. 2006), in which the Third Circuit upheld
summary judgment against a plaintiff asserting ADA claims due to
brain injury. Weisberg had "stress, anxiety and depression that
adversely affect attention, concentration, and speed"; had
"profound, incapacitating fatigue"; "score[d] highly on
intelligence tests, but lower on measures of attention and
concentration, reading comprehension, and working memory"; and
"suffer[ed] from headaches, poor memory and irritability." Id.
at 359-60. Weisberg attended all Giants' home games, ate out
three nights a week, followed his investments in the stock
market, and played games in casinos. Id. at 360. Weisberg
frequently forgot obligations and compensated by keeping more
records or having his secretary remind him; the Weisberg court
held, "Common experience tells us that these are not unusually
restrictive limitations on cognitive function such that they
amount to a 'substantial limitation' indicating that Weisberg is
'severely restricted' . . . ." Id. at 363. Weisberg's
limitations were "narrow and relatively minor." Id. at 362. The

27

Weisberg court concluded: "while Weisberg has produced evidence that he suffers from an impairment, he has not produced evidence from which a trier of fact could conclude that the impairment substantially limits him in the major life activit[y] of cognitive function." Id. at 364.

Plaintiff argues that Weisberg is distinguishable because Weisberg scored in the superior range on some of his cognitive tests and because Weisberg had not submitted evidence about the duration of his impairments. These arguments are unconvincing. Weisberg is persuasive because Weisberg's impairments were similar to Walker's impairments: both suffered from fatigue, stress, and memory problems. The compensatory strategies suggested by one of Walker's doctors, i.e., notes and lists, are similar to Weisberg's compensatory strategies, i.e., records and reminders. The Weisberg court noted that Weisberg had no substantial physical limitations from his brain injury, and Walker also has no substantial physical limitations because he can walk 7-8 miles, hunt, and do other recreational activities.

Applying Weisberg's reasoning, there are no genuine disputes of material fact as to whether Walker was substantially limited in the major life activity of cognitive function and, therefore, Walker lacked a qualifying impairment under the ADA.

28

## 2. There Was No Record of a Qualifying Impairment

There was no record of a qualifying impairment. "Congress included 'record of' disability claims in the ADA to ensure that employees could not be subjected to discrimination because of a recorded history of disability." Eshelman v. Agere Sys., Inc., 554 F.3d 426, 436-37 (3d Cir. 2009). "A plaintiff attempting to prove the existence of a 'record' of disability still must demonstrate that the recorded impairment is a 'disability' within the meaning of the ADA." Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 513 (3d Cir. 2001). In other words, "if the record at issue does not reference a disability or condition covered by the ADA, [the Air Force] is not liable even if it did rely on that record in making the adverse employment decision." Eshelman, 554 F.3d at 437. The Air Force had Plaintiff's nine-page fax, but there was no record of disability within the meaning of the ADA because, as explained above, Walker's impairments were not a disability covered by the ADA.

## 3. Plaintiff Was Not Regarded as Disabled

In addition, a reasonable jury could not find that the Air Force regarded Plaintiff as being disabled. To be "disabled" under the "regarded as" prong of the ADA's disability definition, the plaintiff must

> ha[ve] a physical or mental impairment that does not
> substantially limit major life activities but is
> treated by a covered entity as constituting such

> limitation; Ha[ve] a physical or mental impairment
> that substantially limits major life activities only
> as a result of the attitude of others toward such
> impairment; or Ha[ve] none of the impairments [covered
> by the ADA] but is treated by a covered entity as
> having a substantially limiting impairment.

Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002). The

"perceived disability must . . . substantially limit a 'major

life activity.'" Eshelman, 554 F.3d at 434 (quoting Sutton v.

United Air Lines, Inc., 527 U.S. 471, 490 (1999)). The regarded-

as analysis "focuses not on [plaintiff] and his actual

abilities, but rather on the reactions and perceptions of the

persons interacting or working with him." Kelly v. Drexel Univ.,

94 F.3d 102, 108-09 (3d Cir. 1996).

        Plaintiff argues that the Air Force regarded him as being

disabled because: Barnes, who was the Air Force's representative

under Fed. R. Civ. P. 30(b)(6) and who reviewed Walker's medical

documentation in 2006, said that Walker was disabled; Col.

Snyder discussed Walker's disability in several emails and

questioned whether the disability impacted to Walker's

performance; Walker asked for official duty time to respond to

the first proposed suspension notice based on his "reading,

writing, speech, memory and fatigue related Disability" and was

provided two hours; and, in addressing Walker's request for more

time, Stouck "consider[ed] that Mike does has [sic] a problem".

These facts, i.e., that the Air Force was aware of his impairment, gave him two hours to respond to a suspension notice, and used the word "disability," do not impact whether Walker was regarded as disabled under the ADA. "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." Kelly, 94 F.3d at 109.

Use of the word "disability" is also insufficient to establish that the employee was regarded as disabled. "It is not enough to show that defendants regarded her as 'severely injured' or 'impaired' or even 'disabled,' in the colloquial sense. . . . something more is required under the ADA, i.e., that plaintiff show that she was regarded as having a disability substantially limiting one or more major life activities." Hoskins v. Oakland Cnty. Sheriff's Dep't, 44 F. Supp. 2d 882, 891 (E.D. Mich. 1999); see also Haley v. Cmty. Mercy Health Partners, Civ. 11-232, 2013 WL 322493, at *11 (S.D. Ohio Jan. 28, 2013) (disability under the ADA "is a legal definition quite distinct from the colloquial meaning of 'disabled'").

In addition, granting Plaintiff two extra hours of official duty time to respond to the suspension notice does not constitute regarding Plaintiff as disabled under the ADA. See Spychalsky v. Sullivan, Civ. 10-958, 2003 WL 22071602, at *10

31

(E.D.N.Y. Aug. 29, 2003), aff'd, 96 F. App'x 790 (2d Cir. 2004) (school did not regard student as disabled under the ADA even though it had given him extra time for exams due to student's spelling impairment because spelling was a "specific impairment" and "[t]he recognition of a spelling impairment, even if considered severe, does not constitute a recognition of disability under the ADA"); Benitez v. Sodexho Marriott Servs., Civ. 04-11959, 2004 WL 6241140, at *2 & *7 (D. Mass. Sept. 8, 2004) (employer who granted employee "extra time to accomplish" tasks involving heavy lifting did not regard her as disabled because "[a]t best, the record in the instant case shows only that [defendant] became aware that [plaintiff] suffered from an undefined back condition and was restricted in her ability to lift heavy objects. . . . [plaintiff] has not presented any evidence which would support an inference that anyone at [defendant] considered [plaintiff] to be impaired in her ability to perform any activity of central importance to daily life"). Walker has not adduced any evidence indicating that the Air Force regarded him as substantially limited in any major life activities.

In sum, there are no disputes of material fact as to whether Plaintiff satisfied any of the prongs of the ADA's disability definition: actual disability, record of disability, or regarded as disabled. He was not disabled under the ADA.

Because Plaintiff was not disabled under the ADA, his discrimination and accommodation claims fail. "[T]o establish a prima facie case of discrimination under the ADA, the plaintiff must show: '(1) he is a disabled person within the meaning of the ADA . . . .'" Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (quoting Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998)). "Discrimination under the ADA . . . includes failing to make reasonable accommodations for a plaintiff's disabilities." Id.

Plaintiff's hostile work environment and disparate treatment claims fail for the same reason. See Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 667 (3d Cir. 1999) ("A claim for harassment based on disability, . . . would require a showing that: (1) [plaintiff] is a qualified individual with a disability under the ADA . . ."); id. at 668 ("To establish a prima facie case of disparate treatment, [plaintiff] 'must prove . . . that (1) [he] belongs to a protected class . . .'") (quoting Lawrence v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 68 (3d Cir. 1996)).

**B. The Air Force Did Not Retaliate**

Plaintiff argues that the Air Force retaliated against him because he disclosed his impairments and requested accommodations. Plaintiff need not be disabled to present a retaliation claim, but his retaliation claim still fails.

33

"Unlike a plaintiff in an ADA <u>discrimination</u> case, a plaintiff in an ADA <u>retaliation</u> case need not establish that he is a 'qualified individual with a disability.'" <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 502 (3d Cir. 1997) (emphasis in original); <u>see also</u> <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 188 (3d Cir. 2003) ("[plaintiff]'s failure to establish that she was disabled does not prevent her from recovering if she can establish that her employer terminated her because she engaged in activity protected under the ADA").

"[T]he burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), applies to ADA . . . retaliation claims." <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000). A plaintiff must show: "'(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" <u>Shellenberger</u>, 318 F.3d at 187 (quoting <u>Krouse</u>, 126 F.3d at 500). If the plaintiff establishes these elements of his prima facie case, "'the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action.'" <u>Id.</u> (quoting <u>Krouse</u>, 126 F.3d at 500). To defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, "the plaintiff must point

to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

The Court will assume, without deciding, that Plaintiff established a prima facie case. Defendants' proffered legitimate reasons are: Walker was terminated for a pattern of misconduct, including telling his supervisor to put his performance appraisal "where the sun don't shine," failing to report for duty, repeatedly lying to his supervisors about sick leave, and failing to complete work assignments. No reasonable jury could conclude that these reasons were pretextual or that the Air Force was motivated by retaliatory animus.

### 1. There Was No Direct Evidence

Plaintiff argues that there was direct evidence of discriminatory and retaliatory intent. Direct evidence is "sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on [retaliation] in reaching their decision." Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004). If the plaintiff presents direct evidence of discrimination, then "the employer must prove that it would have fired the plaintiff even if it had not considered

35

his [protected activity]." <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335, 338 (3d Cir. 2002).

Plaintiff argues that there are multiple pieces of direct evidence: "three months <u>after</u> Mr. Walker disclosed his disability directly to Col. Snyder and the [Civilian Personnel Office], . . . Col. Snyder authored an outrageous email . . . ask[ing] about taking action against Mt. Walker <u>for not revealing his disability</u>"; "Snyder even causally relates purported job performance issues with Mr. Walker's disability, and yet seeks to take action against Mr. Walker for failing to disclose the condition"; Beam confirmed "the intent to discriminate against Mr. Walker"; and Kiesow replaced him soon after he disclosed his disability to Snyder. (Pl. Mot. Summ. J. at 41-44.) Plaintiff emphasizes the email in which Snyder asked Barnes, "since Mr. Walker has not revealed his medical condition and it appears that it may/is impairing his ability to perform, can we legally pursue a course that the employee withheld critical medical information . . .?" (Def. Mot. Ex. UU at 2.)

None of this evidence is direct evidence. "[S]tatements made by non-decision makers or by a decision maker unrelated to the decisional process itself are <u>not</u> direct evidence." <u>Glanzman</u>, 391 F 3d at 513 (emphasis in original). Neither Snyder nor Beam was involved in the termination process or even present at McGuire Air Force base when Walker was terminated. When Beam

36

was asked at her deposition "whether [the Air Force] took action because of the injury," she said "I don't know" and acknowledged that Walker was terminated after she retired. (Beam Dep. 42:2-9.) Snyder left Maguire Air Force base in June 2007, over one year before the termination occurred. His emails are not direct evidence because Snyder sent the emails in September 2006, i.e., after Kiesow was reinstated and two years before Walker was terminated; the emails were not part of the decisional processes to terminate Walker or remove him as flight commander.

Plaintiff has not adduced any direct evidence of discrimination. Moreover, even if there were direct evidence, as discussed in the following section, the Air Force would have reinstated Kiesow and fired Plaintiff for legitimate reasons regardless of his disability.

### 2. No Reasonable Jury Could Find Pretext or Retaliatory Animus

Plaintiff cannot show pretext or retaliatory animus through circumstantial evidence. To avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Fuentes v. Perskie, 32 F.3d 759, 764 (3d

37

Cir. 1994) (emphasis in original) (internal citation omitted). A plaintiff can show pretext by "by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' . . . ." Id. at 765 (emphasis in original) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)). Plaintiff cannot sustain this burden either with his termination or his removal from the flight commander position.

### a. Termination

To show pretext, Plaintiff argues that he "did not suddenly change after over a decade of service, but rather those around Mr. Walker changed their perception of him because they knew about his disability and therefore attempted to find issues to document as to support his termination." (Pl. Opp'n Def. Mot. at 14.) Plaintiff argues that the factfinder must consider Snyder's email that he had developed a strategy to deal with Walker's underperformance and Kiesow's email that she was struggling to find proof for his termination.

Plaintiff has not, however, shown weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Air Force's proffered legitimate reasons. In fact, Plaintiff admitted most of the events that Defendants

38

cite: he acknowledged that he told Kiesow to put the appraisal "where the sun don't shine," that he did not send the telephone-service email by the deadline, that he was pheasant hunting when he had asked for sick leave, that he went to court instead of a medical appointment, and that he took his personnel file out of Kiesow's desk even though he originally denied doing so. He also acknowledged that his relationships with all of his supervisors have been difficult.

Plaintiff argues that the evaluations from before and after his disclosure to Snyder show pretext or animus. But these evaluations actually support summary judgment for Defendants. Plaintiff received similar feedback throughout his employment. For example, before the injury, supervisor Bard noted Plaintiff's defensive nature and supervisor Pflanz noted that Plaintiff must appropriately schedule time off and must not respond to work requests by saying he was too busy. After his injury, Kiesow expressed problems with Plaintiff's defensiveness, his scheduling of leave, and his response that he would complete assigned tasks when he could. In addition, after the injury but before Walker disclosed his impairments to Snyder, Plaintiff was admonished for a physical altercation with a subordinate and Pflanz emphasized the importance of telling her when he was going to be late to work. The de-duplication project, the comment about putting the appraisal "where the sun

don't shine," and some of Kiesow's feedback about defensiveness and willingness to carry out assignments also occurred before Walker disclosed his injury to Snyder.

The similarity of feedback from before and after the disclosure to Snyder militates against any finding of pretext. See Anderson v. Radio One, Inc., Civ. 09-194, 2010 WL 3719088, at *11 (E.D. Pa. Sept. 20, 2010), aff'd, 444 F. App'x 596 (3d Cir. 2011) (granting summary judgment because, due to a "pattern of performance criticisms, we find that Plaintiff has not offered evidence sufficient to establish a 'sudden change' in the substance or method of Smith's evaluations"); Shaner v. Synthes, 204 F.3d 494, 504 (3d Cir. 2000) (affirming summary judgment because, inter alia, "Shaner's May 1993 performance evaluation-which Shaner himself viewed to be highly critical-was given several months before he informed Synthes about his disease . . . . [the evaluation] could not have been based on Shaner's disability, which had not yet been made known to the company") (emphasis in original).

Plaintiff argues that "Defendant focuses upon specific instances of criticism within the evaluations, but ignores the overall tone of each evaluation, as well as the actual evaluation result." (Pl. Opp'n Def. Mot. at 12.) But "it hardly would be appropriate for [the court] to second guess that management decision. . . . discrimination statutes . . . are not

intended 'to handcuff the managers and owners of businesses . . . .'" <u>Kelly</u>, 94 F.3d at 109 (quoting <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1083 (3d Cir. 1992)). The issue before the Court is not whether Defendants overly focused on criticisms without acknowledging positives; the issue is whether Defendants' proffered reasons were pretextual or motivated by retaliatory animus. "To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." <u>Fuentes</u>, 32 F.3d at 765. No reasonable jury could conclude that Defendants' proffered reasons, <u>i.e.</u> Walker's pattern of misconduct, were pretextual because Walker admitted to the misconduct and because the pattern was long-standing and began before he disclosed his impairments to Snyder.

### b. Demotion / Replacement From Flight Commander Position

Plaintiff also argues that he was discriminated against when Kiesow replaced him in the flight commander position. Plaintiff argues that Defendant's proffered reasons are inconsistent because Snyder said that Walker was replaced for three different reasons: Kiesow's maternity leave, a policy of

41

promoting officers, and restructuring. Plaintiff emphasizes that there is no evidence of restructuring.

Plaintiff must disprove all three reasons: "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action . . ." Fuentes, 32 F.3d at 764 (emphasis in original). In other words, "if an employer articulates several alternative and independent legitimate, nondiscriminatory reasons, the falsity of one does not necessarily justify finding the remaining articulated reasons pretextual." Logue v. Int'l Rehab. Associates, Inc., 837 F.2d 150, 155 (3d Cir. 1988).[4]

Plaintiff has not adduced any evidence indicating that Kiesow was not on maternity leave when he was the flight commander. Kiesow testified that she was on maternity leave and Walker covered managerial responsibilities during her absence. The dates support the Air Force's maternity leave explanation: Walker was flight commander in the summer of 2006; Kiesow

---

[4] The Fuentes court noted: "We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." Fuentes, 32 F.3d at 764 n.7. This exception is not applicable here.

testified that her son was born in July 2006; the record contains emails from Kiesow, acting in her capacity as flight commander, in June and September 2006. Walker also acknowledged that his salary and grade did not change while he was in Kiesow's position.

Furthermore, other federal laws protect maternity leave; the Court cannot hold that the ADA precluded the Air Force from returning Kiesow to her previous position after her maternity leave simply because Plaintiff shared information about his disability while he was in her position.

Plaintiff has not proffered circumstantial evidence such that a reasonable jury could conclude that the Air Force reinstated Kiesow because of discriminatory animus or that the maternity-leave explanation was pretextual.[5]

## V.    CONCLUSION

The Court will grant Defendants' motion for summary judgment on all claims and deny Plaintiff's motion for summary judgment. No reasonable jury could conclude that Plaintiff was

---

[5] The Court will also grant summary judgment on Plaintiff's aiding and abetting claim because none of the underlying claims survive. See, e.g., Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 307 n.15 (3d Cir. 2004) (because summary judgment was proper on the underlying claims, "any claim . . . for aiding and abetting fails as well"); Cioni v. Globe Specialty Metals, Inc., Civ. 10-01388 (DMC), 2013 WL 1844752, at *4 (D.N.J. Apr. 30, 2013) ("because Plaintiff's underlying discrimination claims fail as a matter of law, Plaintiff's claims based on an aiding and abetting theory . . . also fail").

disabled under the ADA and, as a result, his discrimination, accommodation, hostile work environment, and disparate treatment claims fail. In addition, no reasonable jury could conclude, based on Plaintiff's proffered evidence, that Defendants retaliated against Plaintiff.

The accompanying Order will be entered, and this case will be closed.

**March 18, 2014**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge